UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| VINCENT LEE BRYANT,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>PATRICIA GORMAN,<br><br>　　　　Respondent. | CASE NO.: C07-0652-TSZ<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION AND SUMMARY CONCLUSION

Petitioner is currently in the custody of the Washington Department of Corrections pursuant to his 2004 Whatcom County Superior Court convictions for first degree extortion, unlawful imprisonment, and second degree theft. He has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 seeking relief from those convictions. Respondent has filed an answer to the petition as well as relevant portions of the state court record. Petitioner has filed a reply to respondent's answer. The briefing is now complete, and this matter is ripe for review. This Court, having reviewed the petition, the briefs of the parties, and the state court record, concludes that petitioner's federal habeas petition should be denied and this action should be dismissed with

REPORT AND RECOMMENDATION
PAGE -1

prejudice.

## FACTS

The Washington Court of Appeals summarized the facts relevant to petitioner's conviction as follows:

> The parties in this matter gave two contradictory versions of the facts. The three victims, John Miller, David Miller, and Lucy Barney, all Canadian citizens, testified that they had been to a powwow in Idaho and were driving home to British Columbia after stopping at the Tulalip Casino for dinner. They saw a police car signal them to pull over their motor home, and they did so. David got out to see what was happening, and the trooper told him to go back to the motor home and that they would be on their way shortly. The trooper was actually signaling the car behind them, but assumed the two vehicles were driving together since both pulled over. David testified that as he was waiting, a person who he assumed was a plain clothes officer came around the motor home and told them they were OK and could leave. This person was Bryant.
>
> The motor home continued north on I-5. They later saw more flashing lights behind them. Assuming it was the police, they pulled over. A person dressed in plain clothes entered their motor home and authoritatively identified himself as a police officer investigating a stolen motor home. David recognized him as the same plain clothes officer he had seen before, and during trial all three identified him as Bryant. Bryant told them all to stay in the back of the motor home, and that if they cooperated they would not go to jail. He brought each of them out individually and asked them about the contents of their wallets, whether they had travelers checks, and for the pin numbers for their bank access cards. He also asked whether they had jewelry and at one point reentered the motor home to see the jewelry. The victims later noticed that John's wallet, including his bank card, was missing, as was David's driver's license and birth certificate.
>
> David soon suspected something was amiss. He asked Bryant for identification. Bryant told David he was going to take him to jail and handcuff him. David told Lucy and John to lock the door and call 911. Lucy did so. At that point the car Bryant had been in drove up next to the motor home, Bryant jumped into the passenger seat, and the car took off. The victims chased the car in their motor home. Eventually, they gave police reports and went home. The police did not apprehend Bryant that day.
>
> Bryant presented a completely different version of events. He claimed he went to Tulalip Casino to meet a friend, and was smoking a marijuana cigar in the parking

REPORT AND RECOMMENDATION
PAGE -2

> lot while he waited for her. Two boys he had not previously met, John Miller and his cousin Shawn, came up to him and asked if he had more marijuana. The victims testified that John does not have a cousin named Shawn, and only the three of them were in the motor home during the incident. Bryant testified that John and Shawn eventually said that they had some marijuana they were trying to get rid of. All three went to the motor home together. Bryant saw the marijuana, and John and Shawn offered him a good deal for some of it if he could help them get rid of the rest. He called a friend in Lummi who would meet them at the exit for the rest, and went home to pick up a triple beam scale. Bryant testified that John, Shawn, Lucy, and David followed him to his house in the motor home.
>
> They went as a caravan on the highway toward Lummi. Then, the police pulled him over. The motor home also pulled over, since they were traveling together. While he was stopped, Bryant went up to the motor home and told David to go on ahead and meet him at the Lummi exit. The motor home left. Eventually the officer issued Bryant a warning and let him go. When Bryant arrived at the next exit, everyone in the motor home was really nervous, and John and Shawn wanted to back out of the deal. Bryant said everything was going to be OK, went to the back of the motor home, and took the marijuana bag. He did not want to waste his whole night because they were back pedaling. As Bryant was leaving the motor home, David yelled that Bryant had taken something of theirs, and that he was going to call the police. Bryant took off, and thought the motor home followed him. He never thought they would actually call the police because of all the marijuana. Eventually, to his surprise, Bryant was arrested in Seattle and informed of the claims against him.
>
> The prosecutor impeached Bryant's testimony at trial with earlier inconsistent statements. The jury convicted him on three counts of unlawful imprisonment, three counts of extortion, and one count of second degree theft, but deadlocked on one count of criminal impersonation. Bryant was sentenced to 96 months, the top of the standard range.
>
> Bryant was jailed pending trial. He wanted to represent himself, but claims he had difficulty obtaining legal materials in jail, that the prosecutor did not provide him with timely discovery, and that the court interfered with his right to self-representation. He eventually conceded to representation by counsel because he was given the "Hobson's choice" of either going to trial without the opportunity to prepare or accepting representation. . . .

(Dkt. No. 13, Ex. 2 at 1-5.)

The Court of Appeals also provided a summary of the trial court proceedings as they related specifically to petitioner's self-representation:

REPORT AND RECOMMENDATION
PAGE -3

### 1. Lower Court Proceedings Related to Bryant's Self-Representation

Detective Longoria testified that when Bryant was arrested, he asked for Trierweiler, who he said was his attorney. Trierweiler spoke to Bryant on the phone. At his first appearance on August 20, 2003, Commissioner Snyder and Bryant discussed Bryant's right to have an attorney . . . . Bryant's arraignment was scheduled for August 29, 2003. That day, he made his first request to represent himself . . . . Bryant also requested discovery. The court postponed arraignment for one week at Bryant's request and ordered the prosecutor to provide discovery by 10:00 am on September 2, 2003. The commissioner told Bryant he would "get a copy of any discovery that the Prosecutor has available." Bryant requested access to legal materials, and the commissioner told him to make a formal motion to get those materials. A legal secretary for Eric Richey, the prosecutor, stated that she prepared discovery per the commissioner's instructions, and placed it in the jail pickup box in their office on September 2, 2003.

On September 4, 2003, Bryant appeared pro se in front of Judge Moynihan after successfully noting his motion for access to a law library. The prosecutor noted that Bryant had "expressed a very strong desire to represent himself" and that she was "not sure what arrangements this court needs to make with the jailer or what materials Mr. Bryant needs." Bryant sought court rules and sentencing guidelines. He complained that the jail had given him outdated and incomplete material. He complained that the jail would not give him access to a telephone to talk to witnesses. Bryant said it is very difficult to try to represent himself, and the jail was not giving him help required by the law for pro se defendants. He sought full access to a law library.

The court noted that there was no law library at the jail, and although there was a law library in the courthouse, Bryant would have no access to it because it was open to the public and there was no security. Bryant asked how he would get case law, and the court asked whether he had or wanted a court appointed attorney. Bryant said "not right at this time I do not have an attorney. I'm pro se." He said he did not want a court appointed attorney. Bryant told the court that when he was pro se in Snohomish County, he had a lot of cooperation. The court replied "You got arrested in the wrong county. . . . We do not have a law library available, period." The prosecutor suggested the court appoint him assistant counsel to obtain the materials he sought. Bryant refused to accept that, and said he wanted to handle the case himself.

The prosecutor informed the court that based on Bryant's history, she thought he was "setting up the case for reversing of his convictions should he be convicted." The prosecutor said Bryant should know that he has access to an attorney who could provide him with necessary materials. Bryant said that he would accept a court liaison

REPORT AND RECOMMENDATION
PAGE -4

to help him. But, he said that because the Whatcom County Public Defender's office had represented a family member who was convicted, he would not take an attorney from that office. The court said it would assign standby counsel and make an investigator from the public defender's office available.

Eric Weight, an attorney, approached Bryant on September 4 and offered to help at Bryant's arraignment the next day because he thought Bryant had been inappropriately treated by the court. Bryant was arraigned on September 5. He alleged he had not yet received any discovery, and had sent multiple blue slips requesting access to legal materials which were not answered. Weight's appearance was limited and he did not file a notice of appearance. Although Bryant and Weight subsequently discussed representation, Bryant did not retain Weight and Weight did not speak on Bryant's behalf again. Richey knew that Bryant did not retain Weight.

Richey visited Bryant on September 15. He told Bryant that the court reporter had transcribed the September 4 hearing, and the judge signed the order appointing standby counsel. The order appointing standby counsel had been filed on September 12. Bryant alleged he asked Richey for discovery and witness statements, and the state's information on his offender score. Bryant alleged that Richey told him he would get him the information immediately.[1] Bryant received the transcript of the September 4 hearing on September 26. Bryant sent another blue slip requesting legal materials on September 16; he was told to check with the public defender's office because the jail did not have the materials.

Mike Sparks, a senior investigator with the Whatcom County Public Defender's office, spoke with Bryant on September 15 and 16. He did not provide Bryant with legal materials or discuss the case with Bryant. Bryant asserted his conflict of interest to Sparks. Jon Komorowski, a Whatcom County Public Defender, also spoke to Bryant on September 15 and noted a status hearing for September 18 in front of Judge Nichols. He intended to represent Bryant as a court appointed attorney. He noted that he thought the public defender's office was appointed as standby counsel.

On September 18, Richey saw Komorowski and Bryant talking from across the courtroom. Richey thought Bryant was "acting" because he said several unreasonable things and said them loudly. Richey said Bryant yelled at Komorowski "you are in my face." Komorowski, who had been trying to calmly speak with Bryant, gave up when Bryant did not act reasonably. Richey could not see why

---

[1] [Court of Appeals footnote 1] This presents a question about why Richey would have to provide discovery, as his secretary testified that she had sent him all discoverable materials. The record is unclear as to what materials were presented to Bryant by whom and when.

REPORT AND RECOMMENDATION
PAGE -5

Bryant would be truly upset, and thought he was "putting on a show to develop a conflict of interest." Komorowsi testified that he attempted to provide Bryant with legal materials, including the transcript of the September 4 hearing before Judge Moynihan, and some case law.[2] Bryant refused to accept the materials and threw them at Komorowski. Komorowski testified that his attempts to speak to Bryant were unsuccessful, because Bryant, who was expressing frustration with the system, yelled at him. Komorowski thought it was clear nothing was going to happen at that point and sat down.

Bryant appeared pro se in front of Judge Nichols on September 18. The prosecutor informed the court that Bryant was pro se, and that after Judge Moynihan appointed standby counsel, Bryant had contacted the public defender's office but insisted he had a conflict with that office. The court asked Bryant what he wanted, and Bryant said that according to the jail handbook, law library requests must be sent to the court. He asked for RCWs, saying he wanted to work through the courts and not the public defender's office. He complained that to date, he had only received an outdated copy of Black's Law Dictionary from the jail, which was subsequently withdrawn.

Judge Nichols ordered a new attorney assigned from the conflicts list who was not connected with the public defender's office. The court and Bryant discussed the new attorney:

> The Court: We will just hold the trial date, but if on meeting with this new attorney I am assigned to you, Mr. Bryant – it just facilit[ates] so much if you can have somebody working for you outside.
> The Defendant: No. I want that. I wanted that from the start.

Bryant said he had "asked for law books" and had no cooperation from the jail or other judges.

Douglas Hyldahl filed a notice of appearance as Bryant's attorney on September 23, 2003. Bryant alleges he called the public defender's office on September 22 to request legal materials, but the receptionist denied the request. On September 24, Bryant sent another blue slip requesting legal materials. He alleges he received no response to that blue slip until October 16. Richey's secretary affirmed that all discoverable materials were sent to Bryant through the jail pickup box until their office received a notice of appearance from Hyldahl on September 23. On September 26, Richey's secretary said she received a phone call from the jail stating

---

[2] [Court of Appeals footnote 2] It appears that only the last page of the September 4 transcript was among the materials Komorowski tried to give Bryant.

REPORT AND RECOMMENDATION
PAGE -6

that Bryant had refused to sign for any of the documents the prosecutor's office had sent to his attention.

At the October 2 bail reduction hearing, Bryant did not object when Hyldahl spoke on his behalf. Hyldahl addressed the court on Bryant's representation status:

> A[s] the Court knows, I've come in relatively late in this case, and I don't know how things have gone in court before this. If Mr. Bryant has been inappropriate in court before, he asks for me to apologize for his behavior now. He has been frustrated in his inability to get access to legal material to represent – help me, and he's been frustrated by the logistics of getting those materials. He has asked that I represent him, actually, as his attorney.

Hyldahl spoke on Bryant's behalf throughout the hearing. The prosecutor said that he did not "know what Mr. Hyldahl has received by way of discovery." The prosecutor said he had spoken with Bryant "when he was representing himself." After the court refused to lower bail, Bryant pleaded with the court to lower bail "so I can go out and prove my innocence."

On October 3, Bryant appeared in front of Commissioner Snyder. During the hearing, Bryant reasserted his pro se status multiple times. He repeatedly asked the commissioner to speak to him instead of Hyldahl, stating that Hyldahl was standby counsel. The commissioner repeatedly told him to wait. Hyldahl first stated that he was appointed to represent Bryant, and sought a continuance to prepare for trial. The court noted that there was a speedy trial issue with the continuance, with the period set to expire on November 3. The court then asked Hyldahl whether he was standby counsel, and Hyldahl replied that he was appointed from the conflict list and had filed a notice of appearance, but did not know his status. He said that it would be Bryant's choice, and Bryant wanted him to be standby. Bryant asked to speak with the prosecutor, from whom he had unsuccessfully tried to get discovery materials. The court told Hyldahl to talk to Bryant and see whether he would agree to a continuance, and if not Bryant was going to have to go to trial within the speedy trial period. The prosecutor said that Hyldahl could agree to a continuance over Bryant's objection, but the court noted that would not be effective if Hyldahl was only standby counsel. The State agreed that Hyldahl's status was unclear. Bryant later declared that he finally received discovery from the State in the afternoon after this hearing.

On November 24, 2003, the court entered findings of fact and conclusions of law for Bryant's motion to continue beyond the speedy trial period. The court found that Hyldahl represented Bryant as of October 3. First on October 22 and again on November 24 before the court entered its findings and conclusions, Bryant, through Hyldahl, objected on various grounds. First, he objected that on September 4, standby counsel was initially appointed from the public defender's office over

REPORT AND RECOMMENDATION
PAGE -7

Bryant's objection. Bryant also objected that the reason he felt he had to agree to the continuance was because he was not provided with materials necessary to conduct his defense. He alleged that a failure of discovery was the sole reason he was unprepared to go to trial, and that he would be prejudiced by being tried beyond the speedy trial period. He alleged he was given the choice of agreeing to the continuance or going to trial unprepared, and chose to be represented only because his attempt to defend himself was frustrated. The court refused to make the requested findings on Bryant's lack of access.

On November 25, 2003, Bryant appeared before Judge Nichols and again asserted that he was accepting representation "just to get the slightest bit of a fair trial." He asserted that after going pro se on an earlier trial, he told himself he would always represent himself in the future. But, he felt that even if he still did want to represent himself in this matter, he had already been prejudiced by the county and state.

### 2. Trial Motion to Dismiss and Arguments on Appeal

Hyldahl filed a motion to dismiss under CrR 8.3(b). [3] Hyldahl argued that Bryant's requests for access to a law library went unheeded. No one attempted to provide him with requested legal material until he had already been in custody for 30 days, and was never given adequate resources to proceed with his defense.[4] The court's September 4 order appointing standby counsel was not entered until September 12, and Bryant did not get a copy of it until September 16. [5] Hyldahl argued that the public defender's office rebuffed Bryant's phone calls in the interim, and after meeting with Bryant agreed that there was a conflict of interest. Conflict counsel was appointed September 18, and Hyldahl accepted the case on September 22. Frustrated in his attempts to represent himself, Bryant gave up his right to self-

---

[3] [Court of Appeals footnote 3] Before trial, Hyldahl withdrew and Michael Brodsky, Bryant's trial counsel, appeared. Brodsky filed the notice of appearance on December 4, 2003. Bryant never objected to Brodsky's representation.

[4] [Court of Appeals footnote 4] Bryant alleges the jail refused to give him proper sized paper to file motions, and told him he had to purchase it from the store, even though he was indigent. They would not give him envelopes to assist with mailing legal materials. The store was out of proper sized paper from September 4th through the 24th, so he could not get any even if he wanted to borrow some. The store refused to give him more than one 3 1/4 inch pencil every two weeks, and the pencil was sharpened only once a day at 5:00 am.

[5] [Court of Appeals footnote 5] Richey testified that he gave Bryant a copy on September 15.

REPORT AND RECOMMENDATION
PAGE -8

representation and accepted Hyldahl's representation on October 3.

The State argued that Bryant was not entitled to dismissal under CrR8.3(b) because he did not unequivocally demand to represent himself, had access to the courts through standby counsel, and sufficient speedy trial time to mount an effective defense before he requested a continuance. The State argued that Bryant did not assert his right to self-representation at his first appearance, but instead said he might retain private counsel and asked whether counsel could be present at arraignment. He did not seek to represent himself until August 29, 2003. Then he told Judge Moynihan on September 4 that he did not have representation "right at this time." He alleged a conflict with the public defender's officer [sic], but thanked Judge Moynihan for assigning standby counsel and an investigator. Then on September 5 he used Eric Weight's help at his arraignment rather than act pro se. On September 18, when Judge Nichols told him it would help a lot to have someone working for him outside, Bryant said he wanted that from the start. The State argues that Bryant thereby admitted he wanted an attorney from the start. But, he subsequently again referred to himself as pro se, creating additional confusion. This confusion only increased at the October court hearings. Thus, the State argued that Bryant was not unequivocal in his demand to represent himself.

The State also argued that Bryant was given timely access to the courts. He was arrested on August 19 and made his first appearance the next day. He asked to delay arraignment for a week. With a constructive arraignment date of September 2, his speedy trial would not run until November 3.[6] Standby counsel was appointed on September 4, with almost the full speedy time period left. When Bryant received a copy of the order appointing standby counsel on September 15, he still had 49 days left in his speedy trial period. He had 46 days left when he appeared in front of Judge Nichols on September 18th and was appointed new standby counsel. Hyldahl filed a notice of appearance on September 23. That left 41 days for speedy trial. When Hyldahl moved for a continuance on October 3, Bryant still had 31 days of speedy trial left. However, Hyldahl's request for a continuance put the trial date beyond speedy trial, and the Commissioner found that Bryant and Hyldahl did not claim prejudice. The State argued it is unclear what Hyldahl did between September 22 and October 3.

On December 1, 2003, the parties appeared before Judge Nichols for a hearing on the CrR 8.3(b) motion. The Whatcom County Law Librarian testified that she

---

[6] [Court of Appeals footnote 6] The speedy trial expiration date is variously cited as November 2 or 3 in the record. With constructive arraignment on September 2, 2003 as the state suggested, the 60th day would be November 1, 2003. Because that was a Saturday, speedy trial would expire November 3, 2003.

often received and responded to telephone requests from inmates in custody seeking legal materials, which she would provide. She did not receive a call from Bryant. The jail operations lieutenant testified that the jail does not accommodate pro se defendants other than to allow access to the courts via inmate kites. He testified that phone calls out of the jail are collect, that inmates are not allowed to directly obtain legal materials from any source, and that the jail does not have access to Lexis or Westlaw or, for security reasons, a law library. The jail operations lieutenant admitted he had misplaced one of Bryant's kites requesting access to the law library for 15 to 20 days. He testified that Bryant did not make a request for access to specific legal materials. Weight, Komorowski, and Sparks testified as described above. Hyldahl admitted into evidence some receipts for unspecified materials provided to Bryant from the prosecutor's office to counter Richey's secretary's declaration that Bryant had refused to accept any materials sent to him from the prosecutor's office. The receipts did not identify the materials received. Richey argued that there was no record of late discovery, only his secretary's declaration and these receipts.

> The court noted that Bryant's allegation that he was denied access to justice because he was unable to receive legal and investigative materials also implicated his speedy trial rights, since he had to request a continuance to allow counsel to prepare. The court noted that although Bryant may arguably not have been totally consistent, he stated his desire to represent himself from the beginning and was persistent in requesting various materials. The jail supervisor agreed that Bryant's requests were received but inadvertently were not sent to the superior court clerk. There was disagreement over what discovery materials were delivered, accepted, or rejected. The court found that although there were delays that should not have occurred, there was no prejudice to Bryant's rights, nothing that rose to the level of misconduct or arbitrary state action, and no material effect on Bryant's right to a fair trial. The court denied Bryant's CrR 8.3(b) motion.

(Dkt. No. 13, Ex. 2 at 7-19.)

## PROCEDURAL HISTORY

Petitioner, through counsel, appealed his judgment and sentence to the Washington Court of Appeals. (*See id.*, Exs. 3, 4, 5 and 6.) The Court of Appeals affirmed petitioner's convictions and sentence on August 15, 2005. (*Id.*, Ex. 2.) Petitioner thereafter filed a petition for review in the Washington Supreme Court. (*Id.*, Ex. 7.) Among the issues presented to the Supreme Court for review was that petitioner was denied his right to self-representation, under the state and

federal constitutions, when the trial court and the state "frustrat[ed] his ability to control his case and his access to legal resources[.]" (Dkt. No. 13, Ex. 7 at 1.) The Supreme Court denied review without comment on May 3, 2006. (*Id.*, Ex. 8.) And, the Court of Appeals issued its mandate terminating direct review on June 13, 2006. (*Id.*, Ex. 9.) Petitioner now seeks federal habeas review of his convictions.

## GROUNDS FOR RELIEF

Petitioner asserts a single ground for relief in his federal habeas petition:

> Vincent Lee Bryant (petitioner) was denied the right to self representation in state court on his current criminal conviction.

(Dkt. No. 4 at 5.)

## DISCUSSION

Respondent concedes that petitioner has properly exhausted his state court remedies. Respondent argues, however, that petitioner is not entitled to relief because the state court adjudication of the claim was not contrary to, or an unreasonable application of, clearly established federal law.

### Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act, a habeas corpus petition may be granted with respect to any claim adjudicated on the merits in state court only if the state court's decision was *contrary to*, or involved an *unreasonable application* of, clearly established federal law, as determined by the Supreme Court, or if the decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d) (emphasis added).

01  Under the "contrary to" clause, a federal habeas court may grant the writ only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ only if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Id*. The Supreme Court has made clear that a state court's decision may be overturned only if the application is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 69 (2003).

### Denial of Right to Self-Representation

The Sixth Amendment guarantees a criminal defendant the right to the assistance of counsel in presenting his defense. The United States Supreme Court has recognized that the Sixth Amendment also includes a right to self-representation. *See Faretta v. California*, 422 U.S. 806 (1975).

Petitioner asserts in his petition that he was denied the right to self-representation. Petitioner does not offer any supporting facts in his petition. Instead, he relies on a series of attached documents which include copies of briefs which were submitted to the state courts in his direct appeal. On direct appeal, petitioner argued that he was compelled to relinquish his right of self-representation when the court refused to allow him to speak as his own attorney, denied him access to legal materials, and delayed the appointment of standby counsel who could assist him.

On direct appeal, the Washington Court of Appeals rejected petitioner's claim that the trial court violated his right to self-representation by failing to give him access to legal materials. (*See*

REPORT AND RECOMMENDATION
PAGE -12

01 Dkt. No. 13 at 21.) Respondent argues in these proceedings that this claim is not based upon
02 clearly established federal law as determined by the United States Supreme Court. Respondent
03 asserts that a recent decision of the Supreme Court, *Kane v. Espitia*, 546 U.S. 9 (2005), disposes
04 of petitioner's claim.

05     *Kane* involved a defendant who chose to proceed *pro se* in his state court criminal
06 proceedings and who, despite repeated requests, received no law library access while in jail prior
07 to his trial and very limited access during the trial. *Kane*, 546 U.S. at 9. On direct appeal, the
08 state courts rejected the defendant's argument that his restricted library access violated his Sixth
09 Amendment right to self-representation. *Id*. The Ninth Circuit Court of Appeals reversed, holding
10 that "the lack of any pretrial access to lawbooks violated Espitia's constitutional right to represent
11 himself as established by the Supreme Court in *Faretta*." *Id*. at 10. The Supreme Court then
12 reversed the judgment of the Ninth Circuit. The Supreme Court noted that "[n]either the opinion
13 below, nor any of the appellate cases it relies on, identifies a source in our case law for the law
14 library access right other than *Faretta*." *Id*. The Supreme Court went on to note that "it is clear
15 that *Faretta* says nothing about any specific legal aid that the State owes a *pro se* criminal
16 defendant." *Id*. The Supreme Court concluded that the petitioner, Espitia, did not have a clearly
17 established right under federal law to access to a law library while incarcerated prior to trial and,
18 thus, he was not entitled to federal habeas relief. *Id*.

19     Petitioner, in his response to respondent's answer, concedes that *Kane* precludes any claim
20 that the alleged denial of access to legal materials denied him his right to self-representation.
21 Petitioner continues to argue, however, that his right to self-representation was "fundamentally
22 frustrated" and he was ultimately compelled to forego his right to self representation. The Court

REPORT AND RECOMMENDATION
PAGE -13


of Appeals also rejected this contention on direct appeal. The court explained its conclusion as follows:

> Bryant had adequate time remaining within the speedy trial period to defend himself without a continuance. On October 3, instead of accepting Hyldahl's representation and agreeing to a continuance beyond the speedy trial period, Bryant could have chosen to use Hyldahl as standby counsel and continued to represent himself. Despite his week long vacation that he felt would have prevented adequate preparation to try the case himself, Hyldahl would have been available as standby counsel at trial on the originally scheduled trial date, October 13. Bryant would have had 10 days to prepare, with Hyldahl gone for one week of that time. If that was insufficient time for Hyldahl to assist Bryant in preparing his defense by obtaining materials Bryant requested, the court could have granted a continuance under CrR3.3(h) within the speedy trial period, about 29 days of which remained.
>
> Thus, Bryant had real choices–he could choose, as he did, to accept Hyldahl's representation and agree to a continuance for Hyldahl to prepare. Or, he could choose to continue to represent himself with Hyldahl as standby counsel, and the trial could have been reset at the end of the speedy trial period. Bryant would have had 29 days to prepare, with Hyldahl gone for one week of that time. Or, he could have retained the scheduled trial date with Hyldahl as standby counsel. With acceptable choices that do not show prejudice to his ability to prepare for trial within the speedy trail period, we do not accept that Bryant was forced to accept counsel and to give up his right to self-representation[.] We hold that Bryant's right to self representation was not violated.

(*Id.* at 21-22.)

Respondent argues that because petitioner chose to proceed with counsel, he waived his right to self-representation. Respondent further argues that the state court's decision that petitioner waived his right to self-representation was not contrary to or an unreasonable application of clearly established federal law.

The United States Supreme Court has made clear that a state may not force a lawyer on a criminal defendant when he insists on conducting his own defense. *See Faretta*, 422 U.S. at 806. The Supreme Court has also made clear that a defendant who first elects to conduct his own

defense may subsequently waive his right to self-representation. *McKaskle v. Wiggins*, 465 U.S. 168, 182 (1984). However, the Supreme Court has not identified any specific requirements that must be met in order for a waiver of the right to self-representation to be effective. *See United States v. Singleton*, 107 F.3d 1091, 1096 (4th Cir. 1997).

There is no doubt that petitioner, in the early stages of his case, encountered some obstacles in exercising his right to self-representation. However, as the Court of Appeals explained, petitioner had ample time, once standby counsel was appointed, to prepare his own defense had he desired to do so. Petitioner elected instead to accept representation by the standby counsel who had been appointed for him rather than to proceed on his own. Under the circumstances presented here, and in the absence of any clearly established federal law that mandates a contrary result, this Court must conclude that the Washington Court of Appeals' determination that petitioner waived his right to self-representation when he accepted counsel despite the availability of other choices was entirely reasonable. Accordingly, petitioner's claim that his right to self-representation was violated must fail.

## CONCLUSION

For the reasons set forth above, this Court recommends that petitioner's federal habeas petition be denied and that this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

DATED this 25th day of January, 2008.

Mary Alice Theiler
United States Magistrate Judge